**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CV-24-03011-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| $22,830.00 in US Currency, | |
| Defendant. | |

Before the Court is Plaintiff's (the "Government") Motion for Default Judgment of Forfeiture. (Doc. 9).  On October 31, 2024, the United States of America filed this civil in rem forfeiture action against Defendant $22,830.00 in United States currency (the "Currency").  (Doc. 1).  Because no party appeared, answered, or otherwise pleaded, the Clerk of Court entered default on February 10, 2025.  (Doc. 8).  Plaintiff now moves for default judgment pursuant to Fed. R. Civ. P. 55(b) and Supplemental Rule G. For the reasons set forth below, the Motion is granted.

## BACKGROUND

Because the Clerk entered default, the Court will take the Complaint's factual allegations as true.  *See Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977) (stating that upon default, a complaint's allegations are taken as true, except those relating to damages).  The following facts were alleged in the Complaint.

On October 4, 2023, members of Phoenix Drug Enforcement Administration ("DEA") Financial Investigation Group's Commercial Narcotics Interdiction Unit

("FIG/CNIU") received a ticket information on the travel of an individual identified as passenger Jamal Nasir ("Nasir") who was traveling on a one-way ticket on American Airlines flight #2574 from St. Louis, Missouri to Santa Ana, California with a layover in Phoenix, Arizona. (Doc. 1 ¶ 9). The ticket was purchased within 24 hours of departure. (*Id.*). Law enforcement databases revealed Nasir had a drug history to include laundering narcotics proceeds in multiple states and is a suspected cannabis and psilocybin mushroom distributor in California. (*Id.* ¶ 10). The databases also revealed that in March 2022, a parcel addressed to Nasir was intercepted at his P.O. Box located in Lake Forest, California. (*Id.* ¶ 11). A search warrant was issued for the parcel which resulted in $20,000 being recovered and seized. (*Id.* ¶ 12).

Based on Nasir's flight itinerary and criminal history, DEA Task Force Officers ("TFOs") decided to make a consensual contact with Nasir upon his arrival in Phoenix. (*Id.* ¶ 13). Investigators responded to Phoenix Sky Harbor International Airport Terminal 4, Gate A-12 where American Airlines flight #2574 was due to arrive at approximately 9:40 a.m. (*Id.* ¶ 14). A photograph of Nasir was obtained prior to the flight's arrival from a law enforcement database. (*Id.* ¶ 15). Upon the flight's arrival, investigators observed a male passenger matching the description of Nasir exiting the aircraft. (*Id.* ¶ 16).

DEA TFO Lamberto initiated a consensual contact with Nasir in an open area free of restrictions on Nasir's movement. (*Id.* ¶ 17). TFO Lamberto obtained permission from Nasir to speak with him and to search Nasir's luggage. (*Id.* ¶ 18). TFO Lamberto asked Nasir if he was traveling with any illegal contraband or drugs, which Nasir denied. (*Id.* ¶ 19). When asked if he was traveling with any large amounts of U.S. currency, Nasir hesitated and replied, "[a] little bit. Not much." (*Id.* ¶ 20). When TFO Lamberto asked Nasir how much he was traveling with, Nasir stated he had around $12,000 or $13,000. (*Id.* ¶ 21). Nasir told TFO Lamberto he has bank statements to prove the source of the currency and he owns a jewelry business through which he buys and sells high-end watches. (*Id.* ¶ 22).

Nasir told investigators the U.S. currency belonged to him and was from the sale of

a Rolex watch to a friend in St. Louis.  (*Id.* ¶ 23).  TFO Lamberto asked Nasir for consent to search his bags to which Nasir agreed.  (*Id.* ¶ 25).  TFO Lamberto, again, asked Nasir the amount of U.S. currency he was traveling with, and Nasir changed the amount and said it was near $17,000.  (*Id.* ¶ 26).  Nasir again told investigators the U.S. currency was from the sale of a watch.  (*Id.* ¶ 27).  Nasir explained to TFO Lamberto the high-end watches he sells are more valuable in the Midwest since they do not have access to high-end Rolex stores in St. Louis.  (*Id.* ¶ 28).  TFO Koontz conducted a consent search of Nasir's carry-on bag, which revealed Nasir was in possession of U.S. currency. (*Id.* ¶¶ 29-30).  TFO's search revealed several bundles of U.S. currency which were rubberbanded together and located throughout Nasir's carry-on bag.  (*Id.* ¶ 31).  Nasir also had two large bundles of U.S. currency in a pants pocket, which he stated was his spending money.  (*Id.* ¶ 32).  The appearance of the U.S. currency, rubber-banded together, and consisting mostly of twenty-dollar denominations, is not indicative of a legitimate business transaction.  (*Id.* ¶ 33).  Due to the amount of currency, its appearance, and Nasir's evasive answers, TFO Lamberto asked Nasir if he consented to proceed to the FIG/CNIU office for a verification count of the U.S. currency in Nasir's possession and discuss the U.S. currency in more private setting, to which Nasir agreed.  (*Id.* ¶¶ 34-35).  During this interview, Nasir reiterated his statement that the U.S. currency was earned from the sale of a Rolex he brought with him from California to St. Louis.  (*Id.* ¶ 38).

On October 4, 2023, TFO Liz Poole was asked to conduct a canine sniff test on $22,830.00 in United States currency found in Nasir's luggage.  (*Id.* ¶ 52).  TFO Liz Poole utilized Certified Narcotic Detention Canine "Moxie" to conduct an examination of the currency found in Nasir's possession.   (*Id.* ¶ 53).  Moxie is a 3-year-old black Labrador/Border Collie, trained and certified to detect the odors of cocaine, heroin, methamphetamine, and fentanyl, and she is currently certified with the National Police Canine Association (NPCA) and the National Narcotic Detector Dog Association (NNDDA).  (*Id.* ¶¶ 54-55).  TFO Poole observed that Moxie alerted to the presence of one of the four illegal drugs emanating from the currency found Nasir's carry-on bag and placed

in the file cabinet.  (*Id.* ¶ 62).  Following the canine sniff, an investigative count of the currency was conducted by Sergeant Kaskavage and witnessed by TFO Koontz.  (*Id.* ¶ 63). TFO's investigative count revealed Nasir was transporting $22,830 in U.S. currency.  (*Id.* ¶ 64).

Law enforcement's check of Nasir's income revealed patterns of suspicious activity involving Nasir's businesses and financial accounts, including income from unknown sources and for unknown purposes consistent with funnel account activity, followed by multiple transfers of funds consistent with structuring activity and money laundering.  (*Id.* ¶ 68).  Deposits, withdrawals, and transfers between accounts show multiple patterns of structuring.  (*Id.* ¶ 69).  Cash deposits, wires, checks, cashier's checks, money orders, and debit card purchases involving unusual and rapid movement of funds were transacted in Illinois, California, and Georgia branch locations.  (*Id.* ¶ 70).  The Complaint details transfers of various sums of money to Nasir's JPMorgan Chase Account.  (*Id.* ¶¶ 71-76).

The Currency seized consisted of multiple denominations ($1, $5, $10, $20s, $50s, and $100s) with the overwhelming majority being $20 bills.  (*Id.* ¶ 83).  Most of the currency in Nasir's possession consisted of 860 twenty-dollar bills. This denomination is associated with street level drug sales.  (*Id.* ¶ 85).  On October 4, 2023, DEA seized the defendant property and Nasir was provided with a DEA-12 and told additional information and instructions would be sent in the mail.  (*Id.* ¶ 87).  Nasir provided investigators with a mailing address.  (*Id.* ¶ 88).  Additionally, Nasir was given an email address where he could send any documentation that supported the legitimacy of the seized money.  (*Id.* ¶ 89). Nasir signed the DEA-12 and was given a copy by the TFOs.  (*Id.* ¶ 90).  On December 29, 2023, DEA Headquarters received an online claim and petition from Jamal Nasir through counsel David Nola, Vice Legal, 2915 Red Hill Ave, C103, Costa Mesa, CA 92627 92. (*Id.* ¶ 91).  Nasir, in his petition, claimed he is the owner of the seized $22,830.00 in U.S. currency seized by DEA on October 4, 2023.  (*Id.* ¶ 92).

## LEGAL STANDARD

Once default is entered, the Court may enter default judgment under Rule 55(b).

- 4 -

Deciding to grant default judgment is discretionary and the Court must consider: (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the amount in controversy; (5) the possibility of factual dispute; (6) whether the default was due to excusable neglect; and (7) the strong preference to decide cases on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986). Further, Plaintiff must fully comply with forfeiture procedures. *United States v. $27,800 in U.S. Currency*, 2017 WL 6345394, at *2 (S.D. Cal. Dec. 8, 2017).

## DISCUSSION

For the reasons set forth below, the Court finds the Government has complied with the forfeiture procedures in 21 U.S.C. § 881 and has satisfied the *Eitel* factors. Default judgment is thus warranted.

### A.    Compliance with Forfeiture Procedures

As a threshold matter, the Court finds it is clear the Government has done its due diligence in complying with all required forfeiture procedures.

The Government states that the Currency is liable to forfeiture to the United States for its use in accordance with 21 U.S.C. § 881. (Doc. 1 ¶ 1). Section 881(b) states that "[a]ny property subject to forfeiture to the United States under this section may be seized by the Attorney General in the manner set forth in section 981(b) of Title 18." 21 U.S.C. § 881(b). Pursuant to 18 U.S.C. § 981(b)(2)(A), a seizure may be made without a warrant if "a complaint for forfeiture has been filed in the United States district court and the court has issued an arrest warrant in rem pursuant to the Supplemental Rules for Certain Admiralty or Maritime Claims." 18 U.S.C. § 981(b)(2)(A).

Supplemental Rule G(5)(a)(i) requires that once the government has complied with subsections two through four of the Rule (setting forth the requirements for the complaint, judicial authorization and process and notice), "[a] person who asserts an interest in the defendant property may contest the forfeiture by filing a claim in the court where the action is pending." Supplemental Rule G(5)(a)(ii)(A) provides, "[u]nless the court for good cause sets a different time," that the claim be filed "by the time stated in a direct notice sent under

Rule G(4)(b)."  This stated time must be within "at least 35 days after the notice is sent."  Supplemental Rule G(4)(b)(ii)(B).  Where the government published notice, a claimant who was not sent direct notice may file a claim "no later than 60 days after the first day of publication on an official internet government forfeiture site."  Supplemental Rule G(5)(a)(ii)(b).  After filing a claim, "[a] claimant must serve and file an answer to the complaint or a motion under Rule 12 within 21 days after filing a claim."  Supplemental Rule G(5)(b).

The Court finds that the Government has satisfied the procedural requirements of 18 U.S.C. § 981(b)(2)(A) and Supplemental Rule G, and has complied with all necessary requirements to bring forth this forfeiture action.  First, as required by Supplemental Rule G(2), the Government filed a complaint on October 31, 2024, that states the grounds for jurisdiction and venue, describes the property being forfeited with reasonable particularity, identifies the statute under which the forfeiture action is brought, and includes ample factual detail to support a reasonable belief that the Government will be able to meet its burden of proof at trial.  (Doc. 1).  Second, in accordance with Supplement Rule G(3), the Clerk issued an arrest warrant in rem for the Currency.  (Doc. 3), and on November 5, 2024, process was executed upon the Currency by the U.S. Marshals Service, (Doc. 4).  Third, pursuant to Supplemental Rule G(4)(a), the Government posted notice of the forfeiture on an official government website, www.forfeiture.gov, for at least 30 consecutive days starting on November 5, 2024.  (Doc. 5).  Lastly, the Government also sent notice to known potential claimants, Adriana Jones and Jamal Nasir, as mandated by Supplemental Rule G(4)(b).  (*Id.*).  Specifically, on November 5 and 7, 2024, the Government sent Jones and Nasir notices of judicial forfeiture proceedings and copies of the Complaint for forfeiture by United States Postal Service First-Class Mail and Certified United States Mail to six different addresses.  (*Id.*).

Accordingly, the Government has fully complied with all necessary requirements to proceed with this forfeiture action.

**B.**    ***Eitel* Factors**

### 1. Prejudice to Plaintiff

Denying default judgment would unduly prejudice the Government because it would be required to litigate this action even though no potential claimant has appeared to contest the forfeiture. *See $27,800 in U.S. Currency*, 2017 WL 6345394, at *4 (citing U*nited States v. Approximately $28,000 in U.S. Currency*, 2010 WL 1340110, at *4 (N.D. Cal. Apr. 5, 2010) (pointing out prejudice where the government would have to expend further time and effort in an action that has no opposing party)). This factor weighs in favor of entering default judgment.

### 2. Merits of the Claim and Sufficiency of the Complaint

To prevail in an action under 21 U.S.C. § 881(a)(6), the government must prove by a preponderance of the evidence that the property was either "(1) furnished or intended to be furnished in exchange for a controlled substance; (2) traceable to such an exchange; or (3) used or intended to be used to facilitate a violation of federal drug laws." *United States v. $191,910 in U.S. Currency*, 16 F.3d 1051, 1071 (9th Cir. 1994), *superseded by statute on other grounds by* the Civil Asset Reform Act of 2000 ("CAFRA"), Pub. L. No. 106–185. When the Government's theory of forfeiture "is that the property was used to commit or facilitate the commission of a criminal offense," or was involved in the commission of a criminal offense, it also must establish a substantial connection between the property and the offense. *See* 18 U.S.C. § 983(c)(3). The Government can demonstrate probable cause based on the aggregate of the facts, including any circumstantial evidence. *See United States v. Currency, U.S. $42,500*, 283 F.3d 977, 980 (9th Cir. 2002).

The factual allegations contained in the Complaint satisfy the Government's burden of proof to show by a preponderance that the Currency is subject to forfeiture and that there exists a substantial connection between the Currency and the offense. Nasir told a DEA TFO he was not traveling with any contraband, or drugs and traveling with "a little bit" of U.S. currency. (Doc. 1 ¶¶ 19-20). Nasir claimed he was traveling with approximately $12,000 or $13,000 in his carry-on bag. (*Id.* ¶ 21). Nasir later told DEA TFOs he was in possession of around $17,000. (*Id.* ¶ 26). The final count of the Currency seized from

Nasir was $22,830, more than Nasir claimed.  (*Id.* ¶ 84).  Nasir claimed that he earned the Currency from the sale of a watch, but he could not provide any information (such as receipts, texts or emails with the buyer, or the buyer's last name) to corroborate his story. (*Id.* ¶¶ 38-45).

Courts have held that disingenuous behavior of this sort is probative of a connection between bulk currency carried by travelers and illegal activity.  *United States v. $22,474.00 in U.S. Currency*, 246 F.3d 1212, 1216-17 (9th Cir. 2001) (conflicting statements about the amount of money carried support the inference that currency is drug related); *see also United States v. $252,300.00 in U.S. Currency*, 484 F.3d 1271, 1274 (10th Cir. 2007) (multiple changes to statements about the presence and amount of currency are of "significant probative value"); *United States v. $105,180 in U.S. Currency*, 2013 WL 2153326, at *9 (D. Ariz. May 17, 2013) ("[I]nconsistent and implausible answers regarding [] travel plans and the source of the money further supports a link to illegal activity.").

In addition to the currency found in Nasir's carry-on bag, Nasir had two large bundles of U.S. currency in a pants pocket, which he stated was his spending money.  (Doc. 1 ¶ 32).  The appearance of the U.S. currency, which was rubber-banded together and consisted mostly of twenty-dollar denominations, is not indicative of a legitimate business transaction.  *United States v. $242,484.00*, 389 F.3d 1149, 1161 (11th Cir. 2004) (explaining that legitimate businesses can either wire payments or convert small bills into larger ones, but "those who deal in drug-tainted money cannot avail themselves of such conveniences"); *$27,800 in United States Currency*, 2017 WL 6345394, at *4 (a large amount of cash in twenty-dollar denominations supports the inference that the money is drug-related); *United States v. $36,000.00 in U.S. Currency*, 2018 WL 839865, at *6 (C.D. Cal. Feb. 8, 2018) (large amounts of currency bundled with rubber bands is evidence of a connection to illegal activity); *$105,180 in U.S. Currency*, 2013 WL 2153326, at *8 (same).

Further, Moxie, a trained and certified narcotics detecting canine, gave a positive alert to the defendant currency.  (Doc. 1 ¶¶ 52-62).  An alert to currency by a sophisticated drug detecting dog like Moxie is "strong evidence" of a connection to drug trafficking.

*United States v. $132,245.00 in U.S. Currency*, 764 F.3d 1055, 1059 (9th Cir. 2014) (quoting *$22,474.00 in U.S. Currency*, 246 F.3d at 1216).  Other facts in the Complaint supporting the substantial connection between the Currency and drug trafficking activity includes Nasir's suspicious financial transactions, (Doc. 1 ¶¶ 69-76), and his repeated last minute purchased travel between drug source and demand cities on suspicious itineraries (*id.* ¶¶ 6-8, 79-80).  These facts are of the type that courts in similar cases have found compelling when evaluating whether the Government has met its burden.  *See United States v. $14,000 in U.S. Currency*, 2014 WL 1230497, at *3 (D. Ariz. Mar. 25, 2014) ("A claimant's travel schedule and arrangements are probative in determining whether currency seized from the claimant while traveling is substantially connected to illegal activity"); *$105,180 in U.S. Currency*, 2013 WL 2153326, at *10 (evidence of the claimant's suspicious financial transactions supports a connection between seized currency and illegal drug activity).

Based on the foregoing facts, and the aggregate of the evidence, the second and third *Eitel* factors, the merits of the government's substantive claims and the sufficiency of the complaint, weigh in favor of default judgment.

### 3. Amount in Controversy

The sum of money at stake here is $22,830.00.  The Court is required to consider this amount "in relation to the seriousness of Defendant's conduct."  *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1176 (C.D. Cal. 2002).  Other courts in this District have found greater sums, also seized on suspicion of their relation to the sale of illicit drugs, to be reasonable in light of the seriousness of the alleged crime.  *See United States v. $50,460.00 in U.S. Currency*, 2016 WL 3345488, at *4 (D. Ariz. June 16, 2016); *United States v. $86,496.00 in U.S. Currency*, 2008 WL 2687141, at *2 (D. Ariz. July 2, 2008). This amount is reasonable given the seriousness of the allegations.  This factor supports entering default judgment.

### 4. Dispute Concerning Material Facts

No claim or answer has been filed, so there is no possibility of a factual dispute by

any potential claimant.  "Because upon entry of default, all well-pleaded facts in the complaint are taken as true, the fifth factor weighs in favor of default judgment when the claims in the complaint are well-pleaded." *Durland v. Straub*, 2022 WL 2704169, at *7 (D. Or. July 12, 2022).  This factor supports default judgment.

### 5.  Excusable Neglect

There is no evidence in the record to suggest the default was due to excusable neglect by any potential claimant.  Further, the United States has complied with all noticing requirements.  This factor supports default judgment.

### 6.  Policy Favoring Judgment on the Merits

This factor generally weighs against default judgment.  *See Zekelman Indus. Inc. v. Marker*, 2020 WL 1495210, *4 (D. Ariz. Mar. 27, 2020).  However, because neither Jamal Nasir, Adriana Jones, or any other potential claimant has filed a claim or an answer, a decision on the merits here is "impracticable, if not impossible."  *See $27,800 in U.S. Currency*, 2017 WL 6345394, at *4 (citing *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177).

### CONCLUSION

Because the Government complied with forfeiture provisions and the *Eitel* factors support entering default judgment, the Court will grant the Government's Motion.

Accordingly,

**IT IS ORDERED** Plaintiff's Motion for Default Judgment (Doc. 9) is **GRANTED**.

**IT IS FURTHER ORDERED** the interest of Adriana Jones, Jamal Nasir, and all others in Defendant $22,830.00 in United States currency, is forfeited to the United States of America in accordance with 21 U.S.C. § 881 and 18 U.S.C. § 981(a)(1)(A) and (C).  The Currency shall be disposed of according to law.

…

…

…

…

…

1      **IT IS FURTHER ORDERED** the Clerk of Court is directed to enter judgment

2   accordingly and close this case.

3          Dated this 6th day of June, 2025.

Honorable Roslyn O. Silver
Senior United States District Judge